# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**RICHARD BRUCE BARNCORD, JR.,**

    **Plaintiff,**

vs.

    **Civil Action 2:16-cv-389**
    **JUDGE JAMES L. GRAHAM**
    **Magistrate Judge Kimberly A. Jolson**

**COMMISSIONER OF**
**SOCIAL SECURITY,**

    **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Richard Bruce Barncord, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

**I.**    **BACKGROUND**

Plaintiff applied for benefits in January 2013, alleging disability since November 1, 2012, due to congestive heart failure. (Doc. 8, Tr. 299-301, 302-07, 325). Plaintiff's last-insured date is December 31, 2017. (*Id.*, Tr. 22).

After initial administrative denials of Plaintiff's claims, an Administrative Law Judge ("the ALJ") heard his case on February 3, 2015. (*Id.*, Tr. 37-80). On March 9, 2015, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security

1

Act. (*Id.*, Tr. 20-31). On March 3, 2016, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (*Id.*, Tr. 1-6).

Plaintiff filed this case on May 2, 2016, and the Commissioner filed the administrative record on July 18, 2016. (Doc. 8). Plaintiff filed a Statement of Specific Errors on August 31, 2016 (Doc. 9), and the Commissioner responded on October 17, 2016. (Doc. 10). Plaintiff did not file a reply.

### A. Personal Background

Plaintiff was born in May 1972 (Doc. 8, Tr. 299, 322), and he was 40 years old on the alleged onset date of disability. (*Id.*, Tr. 37). He has a high school education (*Id.*, Tr. 326), and work experience as an account manager, a restaurant manager, and an auto parts sales person. (*Id.*).

### B. Testimony at the Administrative Hearing

Plaintiff testified at the February 3, 2015 administrative hearing that he lives in a house with six steps to enter which he uses twice a day. (*Id.*, Tr. 45-46). He has a driver's license and at the time of the hearing was driving "[a] couple days a week." (*Id.*, Tr. 46). At the time of the hearing, Plaintiff testified that he smoked a pack of cigarettes a week. (*Id.*, Tr. 48-49). He "cut back considerably" after his "last major episode" involving his heart in December 2013. (*Id.*). He tried applying for unemployment benefits in 2012 but was denied because he voluntarily left an employable job. (*Id.*, Tr. 51). During the time he was trying to collect unemployment, he applied for office-type work. (*Id.*, Tr. 52).

Plaintiff testified that, of all his ailments, his fatigue, restlessness and chest pain most interfere with his ability to work. (*Id.*, Tr. 58). Plaintiff also testified to suffering from

depression and anxiety. (*Id.*, Tr. 59). He did not allege any side effects from his current medications, which include aspirin, Plavix, medication for cholesterol and another "to help prevent a future heart attack." (*Id.*, Tr. 60). Plaintiff can take care of his own personal hygiene and dress himself. (*Id.*, Tr. 60-61). He does not cook, but uses the microwave and makes sandwiches; his wife grocery shops and he sometimes goes to the local convenience store a couple of blocks away to get lunch meat or bread; he can empty the top rack of the dishwasher but not the bottom; he does no laundry and does not make his bed. (*Id.*, Tr. 62). He does not sweep or vacuum because he "get[s] winded and sweat[s] profusely." (*Id.*, Tr. 63).

Plaintiff testified he gets pains in his back due to a blockage in his heart. (*Id.*, Tr. 65). Plaintiff also testified that he experienced shortness of breath walking from his kitchen to the living room. (*Id.*, Tr. 67). During the hearing, Plaintiff estimated that he could walk for no more than a block; that he could stand for fifteen to twenty minutes before feeling "drained"; and that he could lift no more than two pounds without getting tired. (*Id.*, Tr. 67-68). Plaintiff also testified that he experiences shoulder pain while sitting. (*Id.*, Tr. 68).

The vocational expert ("the VE") testified that a hypothetical person of similar age and education as Plaintiff with a limitation of sedentary exertional work could not perform Plaintiff's past job, but could perform other jobs available in the national economy such as an addresser, document preparer, or automatic grinder machine operator. (*Id.*, Tr. 75-77). The VE additionally testified that if the employee would be off task ten percent of the time, there would be no sustainable substantially gainful employment available. (*Id.*, Tr. 77).

### C. Relevant Medical Evidence

Plaintiff presented to the emergency room at Belmont Community Hospital for chest pain radiating to his back and neck on December 16, 2012. (Doc. 8, Tr. 402). It was noted he had significant history of cardiac impairments with previous insertion of an automatic implantable cardiac defibrillator and he had not been taking any of his medications except aspirin "for a long time." (*Id.*, Tr. 402). It was also noted that Plaintiff smoked cigarettes every day and declined tobacco cessation education. (*Id.*, Tr. 403). Since nitroglycerin did not improve his pain (*Id.*, Tr. 404-07), Plaintiff was transferred to Wheeling Hospital and underwent emergency cardiac catheterization, as well as the placement of five stents, performed by John Wurtzbacher, M.D. (*Id.*, Tr. 414-15). He was discharged upon stable condition two days later with the diagnoses of acute inferior wall myocardial infarction with successful emergency angioplasty and stenting, residual high grade disease of left anterior descending artery and circumflex obtuse marginal, history of prior myocardial infarction ("MI") and ischemic cardiomyopathy, dyslipidemia, and chronic tobacco use. (*Id.*, Tr. 414).

Plaintiff followed-up with Dr. Wurtzbacher on January 14, 2013. (*Id.*, Tr. 473). Plaintiff complained of chest pressure in response to low level physical activity—even as little as short distance walking with associated dyspnea. He also had occasional palpitations. Dr. Wurtzbacher diagnosed class III angina pectoris. Dr. Wurtzbacher noted a plan to proceed with angioplasty and stenting. (*Id.*, Tr. 473).

Following this visit, Dr. Wurtzbacher completed a Cardiac Impairment Questionnaire (*Id.*, Tr. 465-70) in which he listed clinical findings, including chest pain, shortness of breath, and fatigue. (*Id.*, Tr. 465). Dr. Wurtzbacher also cited the results of a cardiac catheterization

that supported his assessment. (*Id.*, Tr. 466). Plaintiff's primary symptoms were chest pressure, dyspnea on exertion, and palpitations and are precipitated by physical activity, including walking 200 feet. (*Id.*, Tr. 466-67). Dr. Wurtzbacher listed Plaintiff's prognosis as "guarded." (*Id.*, Tr. 465). According to Dr. Wurtzbacher, Plaintiff is able to sit 8 hours a day, but stand/walk only 1 hour a day; could occasionally lift and carry 10 pounds, but never more. (*Id.*, Tr. 467-68). Dr. Wurtzbacher checked boxes noting that Plaintiff has good days and bad days and that he is not a malingerer. (*Id.*).

On January 18, 2013, Plaintiff underwent elective percutaneous intervention of significant stenosis in the left anterior descending artery and obtuse marginal branch of the left circumflex coronary artery. (*Id.*, Tr. 448-49). On February 4, 2013, Plaintiff had an echo-doppler evaluation that revealed moderate to severe reduction in left ventricular systolic function based on the prior anterior myocardial infarction, moderate to severe impairment of left ventricular systolic function, and an ejection fraction of 30%. (*Id.*, Tr. 459).

When seen for follow-up on April 1, 2013, Plaintiff complained of substernal burning radiating up to the back of his throat with walking 1 to 2 blocks. Plaintiff noted that these symptoms were not progressing—they vanish very quickly after he stops walking. Plaintiff also reported that he cut down to smoking 4 cigarettes per day. Dr. Wurtzbacher assessed that clinically, Plaintiff was "getting along reasonably well. He has had continued stable angina at a class 2-3 level." Dr. Wurtzbacher increased his medication. (*Id.*, Tr. 472).

When seen on July 25, 2013, seven months status post-acute MI and angioplasty and stenting, Dr. Wurtzbacher noted Plaintiff has advanced ischemic heart disease with an ejection

fraction of 30%. Plaintiff reported dyspnea and chest pain with a half block of incline. (*Id.*, Tr. 519).

On October 2, 2013, Plaintiff underwent left heart catheterization, coronary angiography, left ventricular function studies, and percutaneous drug-eluting stent placement. (*Id.*, Tr. 783). Upon discharge the following day, Dr. Wurtzbacher noted Plaintiff "received an excellent angiographic result. He is now symptom-free with a normal heart examination." (*Id.*).

By November 6, 2013, Plaintiff reported being "completely pain free." He was down to 3 cigarettes per day. Dr. Wurtzbacher reported Plaintiff was clinically doing well. Dr. Wurtzbacher recommended cutting out other forms of starch if he cannot correct his addiction to Mountain Dew. (*Id.*, Tr. 553).

On May 22, 2014, Plaintiff reported increased shortness of breath and more angina than usual with little physical activity. Dr. Wurtzbacher increased his medication dosage. (*Id.*, Tr. 552).

On January 12, 2015, Dr. Wurtzbacher noted that Plaintiff had a history of multiple coronary interventions with stent placement, a prior heart attack, an ejection fraction of 25% on the most recent heart catheterization, and placement of an internal defibrillator. Dr. Wurtzbacher opined that based on these findings, Plaintiff was unlikely to be able to sustain any job that required standing and walking for 2 out of 8 hours in a work environment and lifting more than 10 pounds or greater. He concluded that he believes that Plaintiff meets the criteria for consideration of disability. (*Id.*, Tr. 576).

Due to continued reported symptoms of throat burning and chest pressure (*Id.*, Tr. 903), Plaintiff underwent a cardiac catheterization on February 5, 2015, which revealed "severe

multivessel coronary artery disease" with poor left ventricular function, 90% stenosis of the major diagonal left anterior descending, 40-60% ostial and 40-50% mid-level stenosis of the left anterior descending, and 35% stenosis of the first marginal circumflex. (*Id.*, Tr. 904-05).

Dr. Wurtzbacher repeated his opinion on February 9, 2015 and on January 11, 2016. (*Id.*, Tr. 907, 920).

Linda Hall, M.D., a state agency physician, reviewed Plaintiff's records on June 18, 2013, and determined that Plaintiff can perform sedentary exertion, noting she was adopting the residual functional capacity ("RFC") findings from the prior ALJ decision of August 27, 2007, based on Acquiescence Ruling 98-4. (*Id.*, Tr. 162). Michael Lehv, M.D. reviewed the file upon reconsideration on August 22, 2013 and concluded that the current file does have new and material evidence since the August 2007 ALJ decision, which changes the ALJ's RFC. Dr. Lehv noted that since the prior ALJ hearing, Plaintiff had another MI, angioplasty, and stenting, which further adds additional non-exertional limitations into his RFC. He further noted that "although one could argue that clmnt's diagnoses are unchanged from ALJ's decision, they have progressed quantitatively so non-adoption is reasonable. Additional restrictions have been added to initial (the ALJ's) RFC." (*Id.*, Tr. 193). Dr. Lehv also noted that according to Dr. Wurtzbacher's treating source statement, Plaintiff would not meet the 4.02B requirements despite his ejection fraction of 30%. (*Id.*).

### D. The Administrative Decision

On March 9, 2015, the ALJ issued an unfavorable decision. (*Id.*, Tr. 20-31). The ALJ determined that Plaintiff had the following severe impairments: coronary artery disease, status post stent implantation; congestive heart failure; ischemic cardiomyopathy status post

defibrillator implantation; lumbar spine spondylosis; obesity; anxiety disorder; affective disorder; and somatoform disorder. (*Id.*, Tr. 23). The ALJ found that he did not, however, meet the requirements of an impairment listed in 20 CFR Subpart P, Appendix 1. (*Id.*).

The ALJ ultimately found that Plaintiff had the RFC to perform sedentary work. Specifically, Plaintiff must be afforded the opportunity to alternate between sitting and standing positions for up to two minutes at a time at fifteen minute intervals without going off task; may occasionally climb ramps or stairs but never climb ladders, ropes or scaffolds; may occasionally balance and stoop but never kneel, crouch, or crawl; should avoid all exposure to extreme cold and heat, and avoid concentrated exposure to wetness, humidity, irritants such as fumes, odors, dust, poorly ventilated areas and chemicals; and is limited to simple, routine and repetitive tasks, requiring only simple decisions, with no fast-paced production requirements and few workplace changes; and should have no interaction with the general public and only occasional interaction with co-workers and supervisors. (*Id.*, Tr. 26). The ALJ found that based on the VE testimony, Plaintiff is unable to perform his past relevant work as an account manager, restaurant manager, and auto parts sales person. (*Id.*, Tr. 29). The ALJ next found that there are jobs that Plaintiff can perform such as an addresser, document preparer, or automatic grinder machine operator, which were not precluded despite his RFC finding. (*Id.*, Tr. 30). He therefore concluded that Plaintiff was not disabled under the Social Security Act. (*Id.*, Tr. 31).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g).

"[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III. DISCUSSION

On appeal, Plaintiff alleges that the ALJ erred by failing to give controlling weight to the medical opinions of treating cardiologist, John Wurtzbacher, M.D., and by giving significant weight to the medical opinions of state agency reviewing physicians, Linda Hall, M.D., and Matthew Lehv, M.D. Plaintiff also contends that the ALJ failed to evaluate properly Plaintiff's subjective statements about the limiting effects of his impairments. (Doc. 9).

### A. Substantial Evidence Supports the ALJ's Decision Not to Defer to Plaintiff's Treating Source Opinions

Plaintiff argues the ALJ erred in failing to give controlling weight to the opinion of his treating cardiologist, Dr. Wurtzbacher. (Doc. 9 at 8-12). Plaintiff maintains that the opinions of Dr. Wurtzbacher are based on appropriate medical findings that are confirmed by longitudinal treatment records and based on appropriate clinical and diagnostic techniques and are not inconsistent with the other substantial evidence in the record. (*Id.*).

Social security regulations recognize several different types of medical sources: treating physicians and psychologists, nontreating yet examining physicians and psychologists, and

9

nontreating/record-reviewing physicians and psychologists. *Gayheart v. Comm'r Social Sec.*, 710 F.3d 365, 375 (6th Cir. 2013).

> As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a "nonexamining source"), and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a "nontreating source"). In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." Soc. Sec. Rul. No. 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996).

*Gayheart*, 710 F.3d at 375 (citations omitted). To effect this hierarchy, the Regulations adopt the treating physician rule. The rule is straightforward. Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion "is not inconsistent with other substantial evidence in [a claimant's] case record." *Gayheart*, 710 F.3d at 376 (citation omitted); *see Gentry*, 741 F.3d at 723. If both conditions do not exist and the ALJ does not give a treating source opinion controlling weight, the ALJ's review must continue:

> When the treating physician's opinion is not controlling, the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors.

*Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The ALJ assigned "little weight" to Dr. Wurtzbacher's opinions, finding that Dr. Wurtzbacher's own treatment records and the other evidence of record show little objective limitations when Plaintiff is compliant with medication. (Doc. 8, Tr. 29). The ALJ also gave consideration to Dr. Wurtzbacher's opinion that Plaintiff "meets the criteria for consideration of

10

social security disability and supplemental income," noting that while this is an issue reserved to the commissioner, he gave it consideration as the opinion of a treating source. (*Id.*).

Plaintiff argues that Dr. Wurtzbacher's opinions are well-supported by medically accepted clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. (Doc. 9 at 12). The Commissioner contends that "the ALJ reasonably weighed the medical opinions at issue and evaluated Plaintiff's statements about the severity of his limitations, and cited substantial evidence supporting his findings." (Doc. 10 at 4). The undersigned agrees. For example, a review of Dr. Wurtzbacher's treatment notes show Plaintiff's heart problems were successfully treated with an angioplasty and implantation of a defibrillator (*Id.*, Tr. 414, 435, 578-87, 783), and that Plaintiff had mostly normal cardiovascular and respiratory functioning thereafter. (*Id.*, Tr. 414, 418, 435, 578-83, 754-55). In addition, Dr. Wurtzbacher continually recommended that Plaintiff stop smoking. (*Id.*, Tr. 414, 472, 654). On a consistent basis, the record shows that Dr. Wurtzbacher reported that "everything was okay" or Plaintiff was "doing well," (*Id.*, Tr. 553). Then, however, Plaintiff would stop taking his medication and end up in an emergency room. (*See id.*, Tr. 754). The ALJ reasonably concluded that Dr. Wurtzbacher's assessed limitations were more restrictive than supported by his own treatment notes. (*Id.*, Tr. 28-29).

Social Security regulations promise applicants, "We will always give good reasons . . . for the weight we give your treating source's opinions." 20 C.F.R. §404.1527(c)(2); *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The good-reasons mandate is satisfied when the ALJ has provided "sufficient reasons for the weight given to the treating source's medical opinions, supported by the evidence in the case record, and must be

11

sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Wilson*, 378 F.3d at 544 (quoting Soc. Sec. Ruling 96-2, 1996 WL 374188 at *5 (1996)).

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied. The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.

*Wilson*, 378 F.3d at 544 (internal citation and quotation marks omitted).

In the present case, the ALJ's explanation for discounting Dr. Wurtzbacher's opinions constituted sufficient detail to satisfy the good-reasons requirement. Considered in context, it is sufficiently clear that the ALJ assigned little weight to Dr. Wurtzbacher's opinions because they were unsupported by his treatment notes and lacked the support of the objective evidence as a whole. (*Id.*, Tr. 28-29). Despite his treating relationship, the opinions Dr. Wurtzbacher expressed did not have sufficient evidence to support their severity, and it was not error for the ALJ to refuse to give them controlling weight.

Turning to the weight assigned to the state agency physicians, Plaintiff argues that the ALJ erred by not applying the correct legal criteria to the opinions of Drs. Hall and Lehv, noting that "[t]here is no authority that permits an ALJ to give greater weight to the opinions from non-treating, non-examining physicians who review a markedly undeveloped record and are not specialists in a relevant area of medicine." (Doc. 9 at 11-12). This argument lacks merit. The ALJ assigned "significant" weight to both Drs. Hall's and Lehv's opinions finding, "[w]hile these doctors did not have the opportunity to examine the claimant, their familiarity with the

record evidence and expertise in this agency's disability program lends their consistent conclusions credibility. Although I have received additional evidence since the consultants offered their opinions, objectively there is little evidence of any reduction in functioning." (Doc. 8, Tr. 29). Given the shortcomings of Dr. Wurtzbacher's opinions, discussed above, and the weight the ALJ reasonably placed on Drs. Hall's and Lehv's opinions, it was not error for the ALJ to rely on the consistency between their opinions. In addition, Dr. Lehv also weighed Dr. Wurtzbacher's opinions and also found that they should be given "little weight" because they were "not fully consistent with the objective [medical evidence] on file." (*Id.*, Tr. 191). The Sixth Circuit "generally defers to an ALJ's decision to give more weight to the opinion of one physician than another where . . . the ALJ's decision is supported by evidence that the rejected opinion is inconsistent with other medical evidence in the record." *Cox v. Comm'r of Soc. Sec.*, 295 F. App'x 27, 35 (6th Cir. 2008).

### B. Credibility and Consistency

Plaintiff contends that the ALJ erred by finding him not credible based upon his purported non-compliance with treatment. (Doc. 9 at 13-16). An ALJ "is not required to accept a claimant's subjective complaints and may consider the credibility of a claimant when making a determination of disability." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d at 469, 476 (6th Cir. 2003) (citing *Walters*, 127 F.3d at 531). An ALJ's credibility determinations about a claimant are to be given great weight. However, they must also be supported by substantial evidence. *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's

13

testimony, and other evidence." *Walters*, 127 F.3d at 531 (citing *Bradley v. Sec'y of Health & Human Servs.*, 862 F.2d 1224, 1227 (6th Cir. 1988)).

The Commissioner responds to Plaintiff's argument by citing SSR 16-3p, 2016 SSR LEXIS 4 (effective March 28, 2016). That Regulation took effect roughly a year after the ALJ issued his decision. (*See* Tr. 31). Although neither side expressly briefed the issue, they seem to disagree on which law applies. (*Compare* Doc. 9 at 13 n.25 *with* Doc. 10 at 15-16).

The text of SSR 16-3p, 2016 SSR LEXIS 4 does not indicate the SSA's intent to apply it retroactively, and the Sixth Circuit has noted that "[t]he [Social Security] Act does not generally give the SSA the power to promulgate retroactive regulations." *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642 (6th Cir. 2006). Further, "[r]etroactivity is not favored in the law. Thus congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 209, 109 S. Ct. 468, 102 L. Ed. 2d 493 (1988). Based on this law, some decisions within the Sixth Circuit have held that SSR 16-3p does *not* apply retroactively. *See, e.g.*, *Cameron v. Colvin*, No. 1:15-CV-169, 2016 U.S. Dist. LEXIS 100920, 2016 WL 4094884 (E.D. Tenn. Aug. 2, 2016). However, other courts within the Circuit have concluded that because SSR 16-3p simply "clarified" the process for evaluating symptoms, the change does not raise concerns. *See, e.g.*, *Patterson v. Colvin*, 2016 U.S. Dist. LEXIS 181599 * (W.D. Tenn. Dec. 16, 2016) ("The court finds that SSR 16-3p, 2016 SSR LEXIS 4 simply "clarifies" the SSA's process for evaluating symptoms, and thus its application in appeals of final decisions of the Commissioner rendered before the ruling was issued does not result in the type of retroactivity disfavored by

cases such as *Bowen*. *Patterson v. Colvin*, 2016 U.S. Dist. LEXIS 181599 * (W.D. Tenn. Dec. 16, 2016).

Here, the Court concludes that it need not resolve whether SSR 16-3p applies retroactively because under either regulation, the ALJ did not err. Social Security Ruling 96-7p ("SSR 96-7p")—the law in effect and used by the ALJ—provides:

> [T]he individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure. However, the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment. The adjudicator may need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner

SSR 96-7p.

The new regulation, SSR 16-3p, in relevant part, provides:

> If an individual's statements about the intensity, persistence, and limiting effects of symptoms are consistent with the objective medical evidence and the other evidence of record, we will determine that the individual's symptoms are more likely to reduce his or her capacities to perform work-related activities . . . . In contrast, if an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, we will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities . . . .

SSR 16-3p, 2016 SSR LEXIS 4, 2016 WL 1119029, at *7. Rather than focusing on credibility, the new ruling focuses on consistency. Viewed under either lens—credibility or consistency—the Court finds that the ALJ analyzed the record appropriately.

The ALJ found that Plaintiff had medically determinable impairments. The ALJ determined, however, that after considering the intensity, persistence, and limiting effect of Plaintiff's impairments, he was capable of a reduced range of sedentary work. (*Id.*, Tr. 26). The ALJ thus found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms[, but] the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible." (*Id.*, Tr. 27). In coming to this conclusion, the ALJ cited treatment notes that showed Plaintiff had mostly normal cardiovascular and respiratory functioning after an angioplasty and implantation of a defibrillator. (Doc. 8, Tr. 28 (citing *id.*, Tr. 414, 418, 435, 578-83, 754-55)). The ALJ also considered how Plaintiff produced written testimony endorsing adverse side effects from his medication, but contradicted himself at the hearing in testifying that he had no side effects or problems with any of his medications. (Id., Tr. 27, (citing *id.*, Tr. 60, 347, 354). Further, the ALJ noted how Plaintiff exacerbated his symptomology by being noncompliant with his medication regimen, although he could effectively manage his symptoms with medication (*id.*, Tr. 28, 578-83, 754-55), and continuing to smoke despite his heart problems. (*Id.*, Tr. 28 (citing *id.*, Tr. 48-49, 414, 654)).

Plaintiff's argument challenging this conclusion essentially makes two points. First, Plaintiff claims that the ALJ relied on "unspecified" objective evidence to doubt Plaintiff's credibility. And, second, Plaintiff claims that the ALJ improperly considered Plaintiff's non-compliance with treatment.

As to his first argument, the Court easily rejects it. The ALJ articulated his finding on Plaintiff's statements about the severity of his limitations and cited substantial evidence to

support his finding throughout his decision, including clinical evidence, medical opinions, evidence of Plaintiff's daily activities, and Plaintiff's testimony.

The Court also rejects Plaintiff's second argument in which he claims that the ALJ improperly considered Plaintiff's noncompliance with treatment. The first part of Plaintiff's argument on this point is that the ALJ should have considered Plaintiff's inability to afford his medication. The trouble with Plaintiff's argument is that Plaintiff himself noted that he failed to take his medication because he "felt good"—not only because he could not afford it. (*See, e.g., id.*, Tr. 28). The ALJ thus did not err in considering Plaintiff's choice not to take his medication at different times during the alleged period of disability.

Plaintiff next claims that the ALJ improperly considered his smoking history. While this Court acknowledges the addictiveness of nicotine, the Sixth Circuit has held that it is proper for an ALJ to consider a smoking habit in the context of credibility and in determining whether such a lifestyle habit is consistent with the allegations of a disabling condition. *Sias v. Sec'y of Health and Human Servs.*, 861 F.2d 475, 480 (6th Cir. 1988); *see also Anderson v. Astrue*, No. 2:07-CV-140, 2009 WL 32935, at *9 (E.D. Tenn. 2009); *Van Heck v.Comm'r of Soc. Sec.*, No. 06-15233, 2008 WL 1808320, at *13 (E.D. Mich. Apr. 21, 2008). Thus, the Court is reluctant to rely on the Seventh Circuit case Plaintiff cites. (*See* Doc. 9 (citing *Shramek v. Apfel*, 226 F.3d 809 (7th Cir. 2000)). Moreover, here, the ALJ relied on a medical record noting that Plaintiff had been "strongly urged" to stop smoking but had refused smoking cessation aids. (*Id.*, Tr. 28 (citing *id.*, Tr. 414)). Accordingly, and considering the context, the Court finds that the ALJ did not improperly consider Plaintiff's smoking.

Based upon the foregoing, the Court finds that the ALJ's assessment of Plaintiff's credibility was based on consideration of the entire record and is supported by substantial evidence.

## IV. RECOMMENDED DISPOSITION

For the reasons stated, it is **RECOMMENDED** that the Plaintiff's statement of errors be **OVERRULED** and that judgment be entered in favor of Defendant.

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

**IT IS SO ORDERED.**

Date: June 30, 2017                              <u>/s/ Kimberly A. Jolson</u>
                                                 KIMBERLY A. JOLSON
                                                 UNITED STATES MAGISTRATE JUDGE